UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

KYLE BURNS, et al.,

                Plaintiffs,

      v.

TD BANK, N.A.,

                Defendant.

Civil Action
No. 1:21-CV-18194-KMW-AMD

**OPINION**

Kenneth J. Grunfeld, Esquire
Philip L. Fraietta, Esquire
E. Adam Webb, Esquire (*pro hac vice*)
Matthew Girardi, Esquire (*pro hac vice*)
Julian Diamond, Esquire (*pro hac vice*)
Jeffrey D. Kaliel, Esquire (*pro hac vice*)

      *Counsel for Plaintiffs Kyle Burns, Ruby Hayes,*
      *Lisa Rodriguez, and Jasmine Norville*

Susan M. Leming, Esquire
Lucus A. Ritchie, Esquire (*pro hac vice*)
Cameron R. Goodwin, Esquire (*pro hac vice*)
Joshua D. Dunlap, Esquire (*pro hac vice*)

      *Counsel for Defendant TD Bank, N.A.*

**WILLIAMS, District Judge:**

## I.  INTRODUCTION

      This matter comes before the Court by way of the Motion of Defendant TD Bank, N.A.

("TD") to Dismiss the Consolidated Amended Class Action Complaint of Plaintiffs Kyle Burns,

Ruby Hayes, Jasmine Norville, and Lisa Rodriguez (collectively, the "Plaintiffs"), pursuant to Fed.

R. Civ. P. 12(b)(6). For the reasons below, TD's Motion to Dismiss is granted, in part, and denied, in part.

## II. BACKGROUND

### A. Procedural History

This putative class action consolidates four separate lawsuits previously commenced against TD in other state and federal courts. On August 13, 2021, Plaintiff Kyle Burns ("Plaintiff Burns") filed a class action complaint against TD in New Jersey state court[1]; TD subsequently removed Plaintiff Burns' action to this Court. (ECF No. 1). On November 12, 2021, TD filed a motion to dismiss Plaintiff Burns' complaint. *See* Am. Compl. ¶ 11. In response to TD's motion, Plaintiff Burns filed an Amended Class Action Complaint, which added Plaintiff Ruby Hayes ("Plaintiff Hayes") as a second plaintiff (the "Burns-Hayes Action"). *See id.* ¶ 12.

Separate from the Burns-Hayes Action, Plaintiff Lisa Rodriguez ("Plaintiff Rodriguez") filed her own putative class action complaint against TD in New Jersey state court alleging similar facts and claims (the "Rodriguez Action").[2] Plaintiff Jasmine Norville ("Plaintiff Norville") also filed a similar class action complaint against TD (the "Norville Action") in the U.S. District Court for the Southern District of New York.[3]

On January 27, 2022, and on joint motion of Plaintiff Norville and TD, the Norville Action was transferred to and docketed in this Court, where the Burns-Hayes Action was taking place.[4]

---

[1] Specifically, Plaintiff Burns initiated his lawsuit against TD in the Superior Court of New Jersey, Law Division (Camden County), under the caption *Burns v. TD Bank, N.A.*, No. CAM-L-002478-21.

[2] The Rodriguez Action was initiated on January 3, 2022, in the Superior Court of New Jersey, Law Division (Middlesex County), and was captioned *Rodriguez v. TD Bank, N.A.*, No. MID-L-000031-22.

[3] *See* No. 1:21-CV-09167-LJL (S.D.N.Y.).

[4] *See* No. 1:22-CV-00416-KMW-AMD (D.N.J.).

Thereafter, on February 11, 2022, the Burns-Hayes and Norville Actions were consolidated for all purposes (the "Consolidated Class Action").[5] This same day, Plaintiff Rodriguez voluntarily dismissed her complaint, without prejudice, in New Jersey state court with the intent to join in the Consolidated Class Action. *See id.* ¶ 18. On February 18, 2022, all Plaintiffs, together and on behalf of themselves and others similarly situated, filed a stipulated Consolidated Amended Class Action Complaint (the "Amended Complaint") pursuant to Fed. R. Civ. P. 15(a)(2). (ECF No. 31).

On March 31, 2022, TD filed a Motion to Dismiss Plaintiffs' Amended Complaint (ECF No. 35), which is the subject of the instant Opinion. Plaintiffs have submitted an Opposition to TD's Motion (ECF No. 35), and TD has filed a Reply thereto (ECF No. 40). On November 2, 2022, the Court heard the arguments of counsel on TD's Motion. (ECF Nos. 67, 68).

## B.  <u>Factual Background</u>

This case arises out of TD's alleged practice of charging overdraft fees on certain debit-card transactions, even though Plaintiffs had sufficient funds in their accounts at the time of these purchases.[6] TD, a subsidiary of Toronto-Dominion Bank, is national bank headquartered in Cherry Hill, New Jersey. *See* Am. Compl. ¶ 26. Plaintiffs either presently have or have previously maintained checking accounts with TD. *See id.* ¶¶ 79–90. Like all of TD's checking-account customers, Plaintiffs were issued debit cards which enabled them to electronically access their accounts for purchases, payments, withdrawals, and other electronic debit transactions. *See id.* ¶ 31. Plaintiffs' checking accounts are governed by a consumer banking agreement (the "Account Agreement"). *See id.*, Ex. B. Checking accounts are also governed by a one-page overdraft-fee

---

[5] *See* No. 1:21-CV-18194-KMW-AMD (D.N.J.).

[6] The factual allegations as recited herein have been extracted from the Amended Complaint. For purposes of considering TD's Motion to Dismiss, the Court takes the factual allegations as true, and draws all reasonable inferences from those allegations in the light most favorable to Plaintiffs. *See Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008).

disclosure (the "Overdraft Fee Disclosure"), which the Account Agreement expressly references and incorporates. *See id.*, Ex. C.

In their Amended Complaint, Plaintiffs challenge TD's overdraft-fee practices with respect to a specific subset of debit-card transactions, which they call "Authorize Positive, Purportedly Settle Negative" transactions ("APPSN transactions"). Am. Compl. ¶ 33. Defining an APPSN transaction first requires an understanding of the mechanics of debit-card transactions.

### 1. *The Stages of a Debit Card Transaction*

The first stage of a debit-card transaction, the "authorization stage," occurs contemporaneously with an accountholder's purchase. When an accountholder physically or virtually "swipes" her debit card, the merchant's debit-card terminal electronically connects with TD, who in turn verifies (1) that the customer's account is valid, and (2) that it has sufficient funds to cover the amount of the purchase. *See id.* ¶ 45. At this point, TD may either authorize or decline the purchase. If TD authorizes the transaction, it immediately reduces the accountholder's available account balance to reflect the purchase, and then purports to set those funds aside to cover it. *See id.* ¶ 46. As a result, the accountholder's available account balance is instantly updated to reflect the reduced amount. *See id.*

But those funds, though no longer included in the accountholder's available balance, are not immediately transferred to the merchant. Though TD has authorized the purchase and reduced the customer's account balance accordingly, TD does not actually transfer those funds to the merchant in real time; that process occurs at a later time, namely at the "settlement stage" of the transaction. *See id.* ¶¶ 46–47. Typically, within one to three business days after the transaction is authorized and the hold on the funds is allegedly instituted, TD "settles" the purchase with the merchant; that is, TD actually transfers those funds electronically to the merchant for the

4

accountholder's prior purchase. *See id.* ¶ 48. Unlike at the authorization stage, at this point TD has no choice but to transfer those funds to the merchant. *See id.* ¶ 49.

### 2. *APPSN Transactions*

As previously mentioned, Plaintiffs only challenge TD's overdraft practices with respect to APPSN transactions. An APPSN transaction is a type of debit-card purchase that is (1) "authorized positive" when the account has sufficient funds, but which is later (2) "purportedly settled negative" (*i.e.* at the settlement stage). *Id.* ¶¶ 33–35. Plaintiffs allege that, after TD authorized Plaintiffs' APPSN transactions at the point of sale, but before TD settled them, Plaintiffs made separate, unrelated purchases that pushed their accounts into a negative balance. In Plaintiffs' view, overdraft fees should have only been assessed against these latter, intervening purchases because they were, after all, the only transactions that sent their accounts into a negative balance. TD indeed assessed overdraft fees on those purchases. But it also assessed additional overdraft fees on the initial APPSN transactions as well, even though they were made when Plaintiffs' accounts had sufficient funds to cover them at the time of purchase.

For example, suppose on Day 1 an accountholder has an available account balance of $100. That same day, she makes a purchase at a grocery store for $40. Because the accountholder's available balance contains $100 (*i.e.*, sufficient funds to cover the purchase), the bank authorizes the purchase, immediately reduces her available account balance by $40, and purports to set those funds aside to cover the transaction. *See id.* ¶¶ 34, 79, 86, 88–89. Thus, her account instantly reflects a $60-dollar available account balance. *See id.* ¶ 37. Suppose further that on Day 2, the accountholder again uses her debit card to pay for a utility bill in the amount of $80. *See id.* ¶ 38. Despite having an account balance of only $60 (*i.e.*, insufficient funds), the bank nevertheless

authorizes the transaction. *See id.* ¶ 76. Like it did with her grocery purchase, the bank instantaneously reduces her account balance, which now reflects a negative balance of –$20.

On Day 5, however, the accountholder sees that her bank has charged her not one, but two overdraft fees. *See* ¶¶ 40, 69. The first was assessed against the transaction on Day 2 to pay for her utility bill. As for the additionally overdraft fee, she learns that it was assessed against her grocery purchase on Day 1. *See id.* ¶¶ 80–83. The accountholder is confused because she had a balance of $100 on Day 1, which was more than enough to cover the $40 grocery purchase. Therefore, she believes she should only be assessed one overdraft fee for her Day 2 purchase because that was the only purchase that overdrafted her account.

But this is not a mistake, and the confusion is explained by how the bank purports to define "overdraft." The bank explains that, although it authorized the accountholder's grocery purchase on Day 1, it did not actually transfer those funds to the recipient until Day 5, when the account had, at this point, a negative balance of –$20 caused by the separate, intervening utility bill payment on Day 2. *See id.* ¶ 38. The bank explained that it did not matter that the accountholder had $100 in her account on Day 1 when she made her $40 grocery purchase. *See id.* ¶¶ 39, 79, 86, 88–89. Nor did it make a difference that the bank reduced her available balance by $40 and placed those funds aside. *See id.* ¶¶ 58–61. Under the bank's conception of "overdraft," the only thing that matters is the accountholder's available account balance at the settlement stage—not the authorization stage. *See id.* ¶¶ 61–62.

To be clear, the accountholder does not take issue with the bank's assessment of an overdraft fee for her payment on Day 2 because that is the purchase, and indeed the only purchase, that negatively tipped her balance into the negative. Rather, she only protests the overdraft fee the bank assessed against her grocery purchase on Day 1—a purchase that, despite being "authorized

positive" on a $100 balance, was nevertheless charged an overdraft fee because it "purportedly settled" on a negative balance days later (*i.e.*, the APPSN transaction). *See id.* ¶¶ 41, 43, 47–49.

### 3. *Plaintiffs' Claims*

Here, Plaintiffs allege that they and others like them have suffered overdraft fees for the same APPSN transactions. *See* Compl. ¶¶ 79–101. This practice, Plaintiffs submit, is not only fraudulent and deceptive, but is also a breach of the underlying Account Agreement governing their checking accounts. In addition, Plaintiffs claim that TD's assessment of overdraft fees is unlawful because APPSN transactions technically do not overdraft their accounts at all. Plaintiffs explain that, at the moment TD authorizes purchases on positive balances, TD simultaneously sets those funds aside and makes them off-limits to the accountholder. In Plaintiff's view, this means that TD always has in its hands the exact amount of money it needs to settle those purchases later, making impossible any notion of an "overdraft" at the settlement stage of these specific transactions.

Based on these alleged facts, Plaintiffs assert four claims, for which they seek monetary damages, restitution, and declaratory relief: (1) breach of contract (Count I); (2) breach of the covenant of good faith and fair dealing (Count I); (3) violation of the New Jersey Consumer Fraud Act; and (4) violation of the New York General Business Law.

## III.  STANDARD OF REVIEW

In deciding a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), a district court is required to accept as true all factual allegations in the complaint and draw all reasonable inferences from those allegations in the light most favorable to the plaintiff, *see Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008), but need not accept as true legal conclusions couched as factual allegations. *Papasan v. Allain*, 478 U.S. 265, 286 (1986). A complaint need not contain "detailed

factual allegations" to survive a motion to dismiss, but must contain "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint "that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do,'" and a complaint will not "suffice" if it provides only "'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (quoting *Bell Atlantic v. Twombly*, 550 U.S. 544, 555, 557 (2007)). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face." *Id.* (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Twombly*, 550 U.S. at 556). A complaint that provides facts "merely consistent with" the defendant's liability "stops short of the line between possibility and plausibility" and will not survive review under Rule 12(b)(6). *Id.* (quoting *Twombly*, 555 U.S. at 557).

## IV.  DISCUSSION

As a threshold matter, the Court observes that the Account Agreement contains a choice-of-law provision providing that the law of the jurisdiction where an accountholder opens their account governs any dispute with respect to the same. *See* Am. Compl., Ex. B at 28. Here, Plaintiffs Burns and Norville opened their accounts in New York (the "New York Plaintiffs"), and thus represent putative members of the "New York Subclass." *Id.* ¶¶ 22, 24. Plaintiffs Hayes and Rodriguez, as accountholders in New Jersey (the "New Jersey Plaintiffs"), represent putative members of the "New Jersey Subclass." *Id.* ¶¶ 23, 25. The presence of two citizenship-based subclasses thus implicates the laws of both New Jersey and New York.

Because this Court's jurisdiction arises out of the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S. Code § 1332(d)(2), "a choice-of-law analysis, applying New Jersey's choice-of-law jurisprudence, is appropriate." *Portillo v. Nat'l Freight, Inc.*, No. 15-7908, 2018 WL 2859289, at *4 (D.N.J. June 11, 2018); *see also Gelis v. Bayerische Motoren Werke Aktiengesellschaft*, No. 2:17-CV-07386, 2018 WL 6804506, at *3 (D.N.J. Oct. 30, 2018). New Jersey courts will generally uphold choice-of-law provisions, so long as the provisions do not violate New Jersey's public policy. *See Carrow v. Fedex Ground Package Sys., Inc.*, No. 16-3026, 2017 WL 1217119, at *3 (D.N.J. Mar. 30, 2017).

Here, the parties appear to stipulate that the Account Agreement's choice-of-law provision does not violate New Jersey public policy; the Court agrees. *See also Galgano v. TD Bank, N.A.*, No. 20-05623, 2021 WL 2472331, at *2 (D.N.J. June 17, 2021) (finding that identical choice-of-law provision did not violate New Jersey public policy in putative class action). Barring any differences in citizenship, Plaintiffs' claims against TD are premised on the same factual allegations and demands for relief. Thus, the Court will apply New York law to the claims of the New York Plaintiffs, and New Jersey law to those of the New Jersey Plaintiffs.

### A.  Breach of Contract

The Amended Complaint alleges that Plaintiffs' APPSN transactions did not actually overdraw their accounts; that TD charged them overdraft fees anyway constituted a breach of the Account Agreement. In its Motion, TD argues that the Account Agreement unambiguously permits its overdraft-fee practices, and that Plaintiffs breach of contract claim should thus be dismissed.

To state a claim for breach of contract under both New York and New Jersey law, a plaintiff must plead (1) the existence of a valid contract; (2) that plaintiff performed under the contract; (3) the defendant's breach of the contract; and (4) damages resulting from the breach. *See Pollack v.*

*Quick Quality Restaurants, Inc.*, 172 A.3d 568, 576 (N.J. Super. Ct. App. Div. 2017); *see also Canzona v. Atanasio*, 118 A.D.3d 837, 839 (N.Y. App. Div. 2014). Because TD's Motion only implicates the third prong of Plaintiffs' contract claim, the question before the Court is whether Plaintiffs have sufficiently alleged a breach of the Account Agreement.

On a motion to dismiss, the Court may dismiss a breach of contract claim for failure to state a claim if the plain language of the contract unambiguously contradicts or fails to support the plaintiff's allegations of breach.[7] *See Abramson v. Affinity Fed. Credit Union*, No. 20-13104, 2021 WL 3885325, at *5 (D.N.J. Aug. 31, 2021); *see also JTRE Manhattan Ave. LLC v. Cap. One, N.A.*, 585 F. Supp. 3d 474, 482 (S.D.N.Y. 2022). Whether a contractual term is clear or ambiguous is a question of law, and any ambiguity must be construed in favor of the plaintiff. *See Abramson*, 2021 WL 3885325, at *5; *see also Subaru Distributors Corp. v. Subaru of Am., Inc.*, 425 F.3d 119, 122 (2d Cir. 2005). Stated differently, a breach of contract claim may not be dismissed "if the terms of the contract are susceptible to at least two reasonable alternative interpretations." *Mercedes-Benz USA, LLC v. ATX Grp., Inc.*, No. 08-3529, 2009 WL 2255727, at *7 (D.N.J. July 27, 2009) (internal quotation marks omitted); *see also L. Debenture Tr. Co. of New York v. Maverick Tube Corp.*, 595 F.3d 458, 466 (2d Cir. 2010) (observing that a contractual ambiguity exists under New York law where the terms of the contract could suggest more than one meaning).

The Amended Complaint appears to articulate two theories of breach, which the Court respectively addresses and refers to in turn as the "timing theory" and the "sufficient-funds theory."

---

[7] The applicable doctrines of contract interpretation under both New Jersey and New York law here are substantively identical. For this reason, the Court will not devote separate analyses to Plaintiffs' claims for breach of contract and for breach of the implied covenant of good faith and fair dealing, both of which are set out in Count I of the Amended Complaint.

### 1. *Plaintiffs' Timing Theory of Breach*

Plaintiffs allege that the Account Agreement promises that TD will make its overdraft determinations when purchases are first authorized, and that TD breached the Account Agreement when it instead made overdraft determinations at the settlement stage (*i.e.*, when their accounts had a negative balance causing the overdraft fee). Articulated differently, had TD made its overdraft determinations at the authorization stage, like the Account Agreement promises, then Plaintiffs' APPSN transactions would never have been assessed overdraft fees (*i.e.*, because APPSN transactions are, by definition, always authorized on positive account balances). TD argues that, to the contrary, the Account Agreement clearly and unambiguously promises that overdraft determinations will be made at the settlement stage.

Turning to the Account Agreement, the Court first takes note of the section entitled "Overdrafts." Am. Compl., Ex. B at 10. Here, TD appears to define "overdraft" as "an advance of funds that exceeds your available Account balance, made by us to you, at our sole discretion." *Id.* Additionally, this section expressly references and incorporates TD's separate, one-page Overdraft Fee Disclosure, which defines "overdraft" as occurring when (1) a customer's "available balance is not sufficient to cover a transaction," but (2) "[TD] pay[s] it anyway." *Id.*, Ex. C.

On their face, these provisions do not indicate when precisely a transaction will have been deemed to "exceed[]" a customer's available account balance, or when the latter will be considered "not sufficient" to "cover" the former. Nor do they unambiguously express when TD "pays" or "advance[s]" funds. Without more, Plaintiffs could "reasonably construe [these] provision[s] as requiring overdraft fees [to] be assessed at the time of the transaction, meaning at the time of the [authorization], as opposed to when the transaction posts." *Varga v. Am. Airlines Fed. Credit*

*Union*, No. 20-4380, 2020 WL 8881747, at *4 (C.D. Cal. Dec. 1, 2020) (denying motion to dismiss breach of contract claim in dispute concerning APPSN transactions).

Moreover, looking at the Account Agreement as a whole, Plaintiffs point to language in the Overdraft Fee Disclosure stating, in relevant part:

> We do not have to *allow you to make an overdraft*. It may be a crime to intentionally withdraw funds from an Account when there are not enough funds in the Account to cover the withdrawal or when the funds are not yet available for withdrawal.

Am. Compl., Ex. C (emphasis added).

The Court construes the phrase "allow you to" to suggest that TD exercises some type of discretion with respect to when an accountholder overdrafts her account. This is important because the Amended Complaint alleges that TD's discretion to authorize or decline any transaction can only exist at the authorization stage. As soon as TD authorizes a transaction, Plaintiffs allege that TD is contractually and regulatorily obligated to transfer those funds to the merchant at the settlement stage. *See* Am. Compl. ¶ 49. These allegations appear to be consistent with the Account Agreement's own disclosures. *See* Am. Compl., Ex. B at 47 ("If a merchant receives authorization for a purchase, TD Bank cannot return that transaction unpaid even if your Account is not in good standing."); *see also id.*, Ex. C (stating the same). If one were to adopt TD's interpretation of "overdraft" as constrained to the settlement stage, how then can TD "allow" or disallow an overdraft when it has, consistent with its own disclosures, already surrendered the very discretion to do so? Such an interpretation would render these disclosures meaningless, suggesting that an overdraft could ostensibly occur at the authorization stage.

In *Roberts v. Cap. One, N.A.*, the Second Circuit recently confronted similar language in a separate overdraft-fees case. *See* 719 F. App'x 33, 36–37 (2d Cir. 2017). There, the court considered whether phrases like "elect to pay" and "Overdraft," as expressed in the customer's

account agreement, could be reasonably read to mean that the bank will assess overdraft fees at the time of a transaction's authorization, as opposed to its settlement; the court held that they could. *See id.* at 36. In reversing the dismissal of the plaintiff's breach of contract claim, the court found that the district court had erred by failing to give meaning to the transitive verb "elect to." *Id.* The bank pointed to other provisions dispersed throughout the account agreement which purportedly clarified that overdrafts are assessed at the time of settlement. *See id.* But the court likewise found those provisions to be "opaque and problematic." *Id.* Specifically, the court noted that the bank's preferred "interpretation of the agreement . . . makes little sense from [the account-holder's] point of view, as a reasonable consumer likely considers something to have been paid for when they swipe their debit card, not when their bank's back-office operations are complete." *Id.* (alterations and omissions in original); *see also Hash v. First Fin. Bancorp*, No. 1:20-CV-1321, 2021 WL 859736, at *5 (S.D. Ind. Mar. 8, 2021) (finding that agreement's statement that bank "may, at [its] discretion, honor withdrawal requests that overdraw your account" did not "help the customer understand whether overdrafts are determined at the time of authorization or settlement").

Thus, with respect to the timing theory of breach, the Court finds that Plaintiffs have offered an alternative, reasonable interpretation of the Account Agreement as to when precisely TD promises to make its overdraft determinations. Key terms and phrases purporting to define "overdraft" are ambiguous. But it is not unreasonable for Plaintiffs to read them to mean that TD "cover[s]" overdrafts—or that it "pays" for and "advance[s]" the funds to "cover" overdrafts—at the authorization stage. *See* Am. Compl., Ex. B at 10; *see also id.*, Ex. C. It is equally reasonable to believe that TD will determine whether an overdraft "exceeds" a customer's available account

balance—or whether the account is "not sufficient" to cover an overdraft—at the authorization stage. *See id.*[8]  On this basis, TD's Motion to Dismiss is denied. *See Roberts*, 719 F. App'x at 37.

## 2. *Plaintiffs' Sufficient-Funds Theory of Breach*

The Court next turns to Plaintiffs' sufficient-funds theory of breach. At the moment of authorization, TD is alleged to "hold" or "sequester" funds authorized on a positive balance, which means that TD always has the funds required to later pay the merchants at settlement. Plaintiffs therefore reason that TD's assessment of overdraft fees on APPSN transactions, despite having removed the very funds needed to cover them at settlement, violates the Account Agreement. In support of these allegations, Plaintiffs point to a portion of the Account Agreement where TD promises that it will, upon authorization

> [1] deduct the amount of the pending transactions from your available Account balance to [2] determine the amount available to pay other items presented against your Account.

Am. Compl., Ex. B at 9–10. Plaintiffs reason that, because TD immediately reduces an account balance and uses the new balance to determine an accountholder's ability to pay for future items, TD must "hold" or make those funds "off-limits" to the accountholder.

TD argues that this theory fails for the immediate reason that the Account Agreement does not expressly contain the terms "hold" or "sequester." To this end, TD cites to *Boone v. MB Fin. Bank, N.A.*, where the court purportedly dismissed a similar breach of contract claim because the agreement contained no express promise to "hold" or "sequester" funds authorized on a positive

---

[8] Likewise puzzling is the Overdraft Fee Disclosure's statement that an overdraft occurs when "there are not enough funds in the Account to cover the *withdrawal*," Am. Compl., Ex. C (emphasis added), when the Account Agreement defines "withdrawal" broadly to include "pending debit card transactions," *id.*, Ex. B at 8. TD points to other portions of the Account Agreement which suggest that overdraft fees will not be assessed on "pending transactions." *See, e.g.*, Am. Compl., Ex. B at 10. But the Court is not persuaded that these provisions eliminate the foregoing ambiguities. Plaintiffs have successfully articulated a reasonable, alternative interpretation of the Account Agreement, and that is all that is required to defeat TD's Motion to Dismiss at this stage of the proceedings.

balance. *See* 375 F. Supp. 3d 987, 991 (N.D. Ill. 2019). But the court in *Boone* predicated its holding on a finding that the defendant bank "pay[s] a given transaction . . . . when an APPSN transaction is presented for settlement." *Id.* at 994. As discussed at length above, this Court cannot make such a finding because terms like "pay", "cover" and "advance" are ambiguous. Thus, *Boone* is readily distinguishable.

TD also argues that its promise to immediately reduce a customer's available account balance by the amount of the authorization has nothing to do with assessing overdrafts because it only does so when it "advance[s]" funds that "exceed[]" an available account balance (*i.e.*, the settlement stage). Def.'s Br. at 10. But TD's reasoning here presupposes the truth of an unfounded conclusion—namely that terms like "pay", "cover", and "advance" exclusively and unambiguously tie TD's overdraft determinations to the settlement stage. But again, that very issue remains unresolved.

During oral arguments, TD further suggested that reducing a customer's account balance merely functions as a type of accounting tool to make sure that "the customer doesn't double commit their funds, so that they aren't out there spending more money than they have in the account." (ECF No. 68 at 16). But how can a customer "double commit" or "spend" money that has already been accounted for and deducted from her account? For instance, how can an accountholder who spends $40 at the grocery be said to "spend[] more money than [she] [has] in her account," *id.*, when the account has an available balance of $100? As TD sees it, she "spends" more money if the account eventually reflects a negative balance. But that would also mean that when the accountholder swipes her debit card, she is not "spending" any money at all; surely that cannot be right. At best, TD's argument here merely begs the original question under Plaintiffs'

15

timing theory of breach—when does an "overdraft" occur within the meaning of the Account Agreement?

Concerning Plaintiffs' sufficient-funds theory of breach, TD has failed to persuade the Court that the Account Agreement plainly and unambiguously reflects its preferred interpretation. Plaintiffs, however, have offered a sufficiently plausible one. While the Account Agreement might not expressly contain terms like "hold" or "sequester," these provisions—when read against the Account Agreement in its entirety—may, at the very least, imply all of the practical indicia of the "hold" Plaintiffs allege. From the accountholder's point of view, this would plausibly make sense given that (1) TD promises to immediately reduce a customer's available account balance when a transaction is authorized (Am. Compl., Ex. B at 9–10); (2) TD states that "paying a particular item" reduces an account balance such that it may "result[] in an insufficient available balance in your Account" (*id.* at 7)[9]; (3) TD promises to rely on that updated account balance "to determine the amount available to pay other items presented against" an accountholder's account (*id.* at 10); and, (4) the accountholder witnesses TD reduce her available account balance in live time when she makes a purchase (Am. Compl. ¶¶ 34, 38, 46).

Having thoroughly reviewed the Amended Complaint, the Account Agreement, the Overdraft Fee Disclosure, and the parties' submissions—and having also heard and considered the parties' arguments on the record—the Court finds that Plaintiffs have articulated sufficiently reasonable interpretations of the Account Agreement such that their breach of contract claim may

---

[9] The portion of the Account Agreement from which this language is quoted appears to warn customers that "paying a particular item [may] result[] in an insufficient available balance in your Account." Am. Compl., Ex. B at 7. But that appears to undercut TD's argument that it "pays" at settlement and that only "pending transactions" (*i.e.*, authorized, but unsettled transactions) can cause customer's balance to drop. But under TD's interpretation of the Account Agreement, the actual "payment" of a transaction should have no effect on a customer's available account balance, much less, as this language suggests to the contrary, "result[] in an insufficient available balance." *See id.*; *cf. id.* at 10 ("[P]ending transactions reduce your available Account balance to pay other transactions and may result in the assessment of overdraft fees for those transactions.").

proceed under both theories of breach. Accordingly, TD's Motion to Dismiss Plaintiff's breach of contract claim is denied. *See Lamoureux v. Trustco Bank*, 592 F. Supp. 3d 14, 27 (N.D.N.Y. 2022) ("[A] contract is ambiguous when it is reasonably susceptible of more than one interpretation." (quotation marks omitted)); *see also Abramson*, 2021 WL 3885325, at *5 (stating that contractual ambiguities must be construed in the plaintiff's favor).

### B.  Breach of Covenant of Good Faith and Fair Dealing

In addition to breach of contract, Count I of the Amended Complaint also asserts a claim for breach of the covenant of good faith and fair dealing. Under the laws of both New Jersey and New York, an implied covenant of good faith and fair dealing is present in all contracts. *See Emerson Radio Corp. v. Orion Sales, Inc.*, 253 F.3d 159, 169–70 (3d Cir. 2001); *see also InterDigital Commc'ns Corp. v. Nokia Corp.*, 407 F. Supp. 2d 522, 536 (S.D.N.Y. 2005). The essence of the covenant reflects a mutual commitment that "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Coldwell Banker Real Est., LLC v. Plummer & Assocs., Inc.*, No. 09-1313, 2009 WL 3230840, at *3 (D.N.J. Oct. 2, 2009); *see also InterDigital Commc'ns Corp.*, 407 F. Supp. 2d at 536.

TD moves to dismiss Plaintiffs' implied covenant claim because it duplicates their claim for breach of contract. It is true that dismissal of an implied covenant claim is appropriate where it is merely "duplicative of [a] breach of contract claim." *Intervet, Inc. v. Mileutis, Ltd.*, 2016 WL740267, at *5 (D.N.J. Feb. 24, 2016); *see also Harris v. Provident Life & Accident Ins. Co.*, 310 F.3d 73, 81 (2d Cir. 2002). Such claims are deemed duplicative of each other when both are alleged to have arisen from the same facts and actions. *See Intervet, Inc.*, 2016 WL 740267, at *5; *see also Harris*, 310 F.3d at 81 ("New York law . . . does not recognize a separate cause of action

for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled.").

Here, the Plaintiffs' allegations supporting their claim for breach of an implied covenant rely on and incorporate the same facts pled in support of their breach of contract claim. *Compare* Am. Compl. ¶ 4 ("TD should not have used its discretion to charge OD Fees on APPSN Transactions. The Account Documents do not provide any basis for TD to charge OD Fees on APPSN Transactions.") *with id.* ¶ 76 ("TD uses its contractual discretion to cause APPSN Transactions to incur OD Fees by knowingly authorizing later transactions that it allows to consume available funds previously sequestered for APPSN Transactions."). Plaintiffs cannot "merely recite the same conduct it alleges for [TD's] breach of contract and transform such conduct into a breach of the implied duty of good faith and fair dealing." *Intervet*, 2016 WL 740267, at *5; *see also Richard v. Glens Falls Nat'l Bank*, No. 1:20-CV-00734, 2021 WL 810218, at *15 (N.D.N.Y. Mar. 3, 2021) (dismissing implied covenant claim where allegations were merely a "repackaging of [the] breach of contract theory"). Accordingly, Count I of the Amended Complaint is dismissed, without prejudice, but only to the extent that it asserts a claim for breach of the implied covenant of good faith and fair dealing; Plaintiffs' breach of contract claim under Count I remains.[10]

### C.  State Consumer Fraud Claims

Counts II and III of the Amended Complaint respectively set forth claims under the New Jersey Consumer Fraud Act (the "CFA") and the New York General Business Law (the "GBL"). TD presents three independent bases for dismissal. Specifically, TD argues that these claims

---

[10] Because Plaintiffs' implied covenant claim is dismissed as duplicitous, the Court declines to address TD's other arguments for dismissal.

should be dismissed because (1) the Account Agreement expressly permits TD's overdraft practices; (2) the claims are duplicative of Plaintiffs' claim for breach of contract; and (3) the claims are preempted by federal law.

At the outset, the Court rejects TD's first argument that Plaintiffs' consumer fraud claims should be dismissed because the Account Agreement unambiguously permits the overdraft practices at issue. Dismissal on this basis is unwarranted because the Court has already found that the Account Agreement is ambiguous. Consequently, the Court only considers TD's remaining two arguments.

### 1. *New Jersey Plaintiffs' CFA Claim*

The Court first addresses TD's duplicity argument with respect to the New Jersey Plaintiffs' claim under the CFA. To state a claim under the CFA, a plaintiff must allege (1) unlawful conduct; (2) an ascertainable loss; and (3) a causal relationship between the unlawful conduct and the ascertainable loss. *Harnish v. Widener Univ. Sch. of L.*, 931 F. Supp. 2d 641, 648 (D.N.J. 2013). Where a CFA claim is predicated on a valid contract, a plaintiff must further allege a "substantial aggravating circumstance." *Suber v. Chrysler Corp.*, 104 F.3d 578, 587 (3d Cir. 1997). A substantial aggravating circumstance is "the existence of bad faith or lack of fair dealing, sufficient to constitute an unconscionable business practice." *Petri Paint Co. v. OMG Americas, Inc.*, 595 F. Supp. 2d 416, 421 (D.N.J. 2008) (quotation marks omitted).

Here, the New Jersey Plaintiffs allege that TD, as the sole author of the Account Agreement, deceptively misrepresented the true nature of its overdraft practices; employed overdraft practices that were contrary to the overall net impressions the Account Agreement worked to create; and did so for the purpose of increasing its overdraft-fee revenue. *See* Am. Compl. ¶¶ 40–42. These allegations are sufficient to plead substantial and aggravating

circumstances. *See Hughes v. TD Bank, N.A.*, 856 F. Supp. 2d 673, 681 (D.N.J. 2012) (permitting CFA claim to proceed where plaintiffs alleged that defendant "used its superior bargaining position and sophistication to develop a counterintuitive system of gouging those customers least able to afford overdraft fees"). Whether TD's overdraft practices are "unconscionable" is a consideration reserved for a factfinder. *Suber v. Chrysler Corp.*, 104 F.3d 578, 587 (3d Cir. 1997).

### 2. *New York Plaintiffs' GBL § 349 Claim*

The Court next addresses whether the New York Plaintiffs' § 349 claim is duplicative of their breach of contract claim. Similar to the CFA, the GBL makes it unlawful to engage in "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in [New York] state . . . .". N.Y. Gen. Bus. Law § 349(a). To state a claim under GBL § 349, a plaintiff must allege (1) that the challenged act or practice was consumer-oriented; (2) that it was misleading in a material way; and (3) that the plaintiff was harmed as a result of the deceptive act. *See Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 490 (2d Cir. 2014).

TD argues that the New York Plaintiffs § 349 claim fails to allege "any misleading acts or practices 'separate and apart' from the breach of contract allegations." Def.'s Br. at 26. Some courts adjudicating similar cases within the Second Circuit have dismissed § 349 claims that fail to allege an act or practice that was misleading in a material respect "separate and apart" from the allegations that the defendant violated an underlying contract. *See, e.g.*, *Perks v. TD Bank, N.A.*, 444 F. Supp. 3d 635, 642 (S.D.N.Y. 2020). More recently, however, other courts have allowed § 349 claims to proceed alongside breach of contract claims where a banking defendant is alleged to have used misleading contractual language to deceive consumers about the true nature of their overdraft-fee practices.

For example, in *Richard v. Glens Falls Nat'l Bank*, the plaintiff asserted against her bank a factually similar § 349 claim, as well as a claim for breach of contract. *See* No. 1:20-CV-00734, 2021 WL 810218, at *17 (N.D.N.Y. March 3, 2021). In support of her § 349 claim, the plaintiff alleged that the bank's use of "misleading contractual language caused her to incur [o]verdraft [fees] . . . [and] that, but for [d]efendant's deceptive conduct, she would not have been charged." *Id.* The court held that these allegations were sufficiently distinct from the alleged conduct pled in support of her breach of contract claim. *See id.*

Here, like in *Richard*, the New York Plaintiffs allege that TD used deception and misrepresented the true nature of its overdraft practices; employed overdraft practices that were contrary to the overall net impressions the Account Agreement worked to create; and did so for the purpose of increasing its overdraft-fee revenue. *See* Am. Compl. ¶¶ 40–42. These alleged acts are sufficiently distinct from the allegations that TD violated the terms of the Account Agreement. *See Lamoureux v. Trustco Bank*, 592 F. Supp. 3d 14, 41 (N.D.N.Y. 2022) (denying dismissal of § 349 claim involving APPSN transactions); *see also Lussoro v. Ocean Fin. Fed. Credit Union*, 456 F. Supp. 3d 474, 490–91 (E.D.N.Y. 2020) (denying dismissal of § 349 claim where account agreement was alleged to "trick a consumer, even if unintentionally, into believing they will only be assessed an overdraft fee at the time of authorization, when, in fact, [the bank] also imposes overdraft fees at the time of settlement").

### 3. *Preemption*

Lastly, the Court addresses TD's argument that Plaintiffs' claims under the CFA and GBL § 349 should be dismissed because they are preempted by the National Bank Act ("NBA"). Because these matters implicate matters of federal law, the Court will address TD's argument with respect to both Counts II and III.

The Supremacy Clause dictates that "the Laws of the United States . . . shall be the supreme Law of the Land," U.S. CONST. art. VI, and "any state law, however clearly within a State's acknowledged power, which interferes with or is contrary to federal law, must yield." *Kurns v. A.W. Chesterton, Inc.*, 620 F.3d 392, 395 (3d Cir. 2010) (quoting *Free v. Bland*, 369 U.S. 663, 666, (1962)) (internal quotation marks omitted). Thus, "[w]here a state statute conflicts with, or frustrates, federal law, the former must give way." *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 663 (1993). Federal regulations likewise work to preempt state law with the same effect as the federal statutes under which they were promulgated. *See Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982) ("Federal regulations have no less pre-emptive effect than federal statutes."). Furthermore, "[w]here federal preemption applies, it bars both a direct assertion of state law by a state legislature . . . and the assertion of state law causes of action by private plaintiffs based on laws of general applicability." *In re TD Bank, N.A.*, 150 F. Supp. 3d 593, 606 (D.S.C. 2015) (citing *Smiley v. Citibank (S.D.), N.A.*, 517 U.S. 735, 738 (1996)).

The Supreme Court has identified three major situations where federal preemption occurs:

> (1) "express" preemption, applicable when Congress expressly states its intent to preempt state law; (2) "field" preemption, applicable when "Congress' intent to pre-empt all state law in a particular area may be inferred [because] the scheme of federal regulation is sufficiently comprehensive" or "the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject;" and (3) "conflict" preemption, applicable when "state law is nullified to the extent that it actually conflicts with federal law," even though Congress has not displaced all state law in a given area.

*Fellner v. Tri–Union Seafoods, LLC*, 539 F.3d 237, 242 (3d Cir. 2008) (quoting *Hillsborough County v. Automated Med. Labs.*, 471 U.S. 707, 712 (1985)). Here, TD's Motion raises only the first and third modes of preemption—express preemption and conflict preemption. Although preemption is an affirmative defense, which TD has the ultimate burden of proving, this defense may also be raised at the motion to dismiss phase. *See Lupian v. Joseph Cory Holdings LLC*, 905

F.3d 127, 130 (3d Cir. 2018). However, when raised at the dismissal stage, the "[f]acts alleged in the complaint are accepted as true for purposes of the motion," and dismissal is appropriate only where "preemption is manifest in the complaint itself." *Id.* (citing *Iqbal*, 556 U.S. at 678) (internal quotation marks omitted).

To this end, TD argues that Plaintiffs' state consumer fraud claims are preempted by the NBA, as well as by the regulations promulgated by the Office of the Comptroller of the Currency (the "OCC"). *See* Def.'s Br. at 27–28; *see also* Def.'s Reply at 9–11. The business activities of national banks, like TD, "are controlled by the [NBA] and [by] regulations promulgated thereunder by the [OCC]." *Watters v. Wachovia Bank, N.A.*, 550 U.S. 1, 1 (2007). The NBA vests nationally chartered banks with enumerated powers, which includes, among other things, the power to "receive deposits." 12 U.S.C. § 24 (Seventh). The NBA also authorizes national banks to exercise all such "incidental powers as shall be necessary to carry on the business of banking." *Id.* In connection with its interpretive authority, the OCC has stated that such incidental powers include, among other things, the ability to "charge its customers non-interest charges and fees" (*i.e.*, overdraft fees). 12 C.F.R. § 7.4002(a).

TD's overarching preemption argument points to an OCC regulation stating that a national bank "may exercise its deposit-taking powers without regard to state law limitations concerning . . . disclosure requirements." *Id.* § 7.4007(b)(3). Thus, TD reasons that Plaintiffs' state consumer fraud claims are expressly preempted by § 7.4007(b)(3) because they effectively "seek[] to regulate TD's overdraft fee disclosure. Def.'s Br. at 27.

As an initial matter, it appears that TD misconstrues Plaintiffs' state consumer fraud claims. The Amended Complaint does not challenge the "sufficiency" or "adequacy" of TD's overdraft disclosures. Rather, they seek to hold TD liable for harm allegedly caused by its misleading and

deceptive tactics, and for misrepresenting the circumstances under which an overdraft fee would be imposed. Second, there is no indication that the NBA or the OCC's regulations expressly preempt Plaintiffs' CFA and GBL § 349 claims, much less with the categorical breadth TD implies. While TD may "exercise its deposit-taking powers without regard to state law limitations concerning . . . disclosure requirements," 12 C.F.R. § 7.4007(b)(3), neither the CFA nor GBL § 349 impose any particular disclosure requirement on national banks. To the contrary, they prohibit misleading, deceptive, and harmful commercial practices. *See Gutierrez v. Wells Fargo Bank, NA*, 704 F.3d 712, 726 (9th Cir. 2012) (holding that consumer fraud claims under California Unfair Competition Law was not preempted by NBA) ("Notably, the [UCL] itself does not impose disclosure requirements but merely prohibits statements that are likely to mislead the public."). For these reasons, the Court finds that the NBA does not expressly preempt Plaintiffs' state consumer fraud claims. *See id.*; *see also Lussoro*, 456 F. Supp. 3d at 488 (finding GBL § 349 claim was not preempted where claim was "premised on [d]efendant's misrepresentations regarding its overdraft policy," rather than on the credit union's "ability to determine or charge these types of fees"); *Whittington v. Mobiloil Fed. Credit Union*, No. 1:16-CV-482, 2017 WL 6988193, at *9 (E.D. Tex. Sept. 14, 2017) (finding claims that defendant credit union furnished misleading and false information were not preempted).

The Court next turns to TD's argument that Plaintiffs' consumer fraud claims are conflict preempted. Conflict preemption has historically been observed where either (1) compliance with both federal and state law is a "physical impossibility," *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142–143 (1963), or (2) where the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941). "In the context of the national banking industry, [however,]

the question of conflict preemption is more refined." *In re TD Bank, N.A.*, 150 F. Supp. 3d 593,
605 (D.S.C. 2015). "Federally chartered banks are subject to state laws of general application in
their daily business to the extent such laws do not conflict with the letter or the general purposes
of the NBA." *Watters v. Wachovia Bank, N.A.*, 550 U.S. 1, 11 (2007). It is, however,
simultaneously recognized that "Congress would not want States to forbid, or to impair
significantly, the exercise of a power that [the NBA] explicitly granted." *Barnett Bank of Marion
Cnty., N.A. v. Nelson*, 517 U.S. 25, 33 (1996).

Adapting the forgoing authorities here—with the understanding that "banks are subject to
state laws of general application in their daily business", *Watters*, 550 U.S. at 11—the Court
considers whether Plaintiffs' CFA and § 349 claims "forbid" or "impair significantly" TD's
powers under the NBA, *Barnett*, 517 U.S. 25, 33 (1996). The Court concludes that they do not.

Federal courts have found certain state law claims brought by private litigants to be
conflict-preempted by the NBA, but only where they attack the fairness of banking disclosures,
mandate certain practices, or mandate specific disclosure language. *See, e.g.*, *Gutierrez*, 704 F.3d
at 718 (reversing court-ordered permanent injunction requiring bank to eliminate "high-to-low"
posting order and to instead reinstate "low-to-high" posting order on the basis that the former was
inherently "unfair"); *Martinez v. Wells Fargo Home Mortg., Inc.*, 598 F.3d 549, 554 (9th Cir.
2010) (finding conflict preemption where plaintiffs based their claims on the contention that bank's
overdraft fees were too high and thus unfair); *Montgomery v. Bank of America Corp.*, 515 F. Supp.
2d 1106, 1113 (C.D. Cal. 2007) (dismissing plaintiff's state law claims "based on the amount of
and means of disclosure" of overdraft fees).

Numerous federal courts have observed that state consumer fraud claims, as well as the
statutes underlying them, are not conflict-preempted because they do not "impose disclosure

requirements but merely prohibits statements that are likely to mislead the public." *Gutierrez*, 704 F.3d at 726 (holding that state statute's prohibition on fraudulent and/or misleading statements was not preempted by NBA); *see also Lussoro*, 456 F. Supp. 3d at 489 (finding § 349 claim not preempted because it "neither prohibits any behavior required by the FCUA and its implementing regulations, nor requires Defendant to engage in behavior prohibited by these federal laws"); *In re Checking Acct. Overdraft Litig.*, 694 F. Supp. 2d 1302, 1313 (S.D. Fla. 2010) (denying motion to dismiss state law consumer fraud claims as preempted by NBA); *In re HSBC BANK*, 1 F. Supp. 3d at 45 ("The New York . . . consumer protection laws upon which the [p]laintiffs based their claims do not prohibit any behavior required by the NBA or the OCC regulations.").

Here, TD argues that Plaintiffs' claims are conflict-preempted because they essentially challenge "when and how TD may assess overdraft fees." Def.'s Br. at 27. However, Plaintiffs argue that their consumer fraud claims are not that TD Bank lacks the right to choose its own disclosures. Nor do their claims demand any specific disclosure be included in the Account Agreement. Rather, Plaintiffs argue that TD conducted its overdraft practices at their expense, in an allegedly misleading and deceptive manner, and that they should accordingly be held liable for such conduct. At best, it might be said that Plaintiffs' claims merely touch on TD's disclosures. But that is not enough for preemption. Indeed, "such an expansive interpretation—with no limiting principle—would swallow all laws." *Gutierrez*, 704 F.3d at 712 (internal quotation marks omitted).

Having already found that Plaintiffs' state consumer fraud claims are not expressly preempted by the NBA, here too the Court finds that they are likewise not conflict-preempted. Plaintiffs' claims arise out of state laws of general application, and can hardly be said to implicate, much less significantly impair, TD's deposit-taking powers under the NBA. *See In re Checking*

*Acct. Overdraft Litig.*, 694 F. Supp. 2d at 1313 (holding that NBA did not conflict with state consumer fraud claims) ("[T]hese allegations do no more than incidentally affect the banks' exercise of their deposit taking power and are therefore not preempted."). TD's Motion to Dismiss Counts II and III of the Amended Complaint is accordingly denied.

## V.   **CONCLUSION**

For all of the reasons set forth above, TD's Motion to Dismiss the Amended Complaint is granted, in part, and denied in part. TD's Motion to Dismiss Count I of the Amended Complaint is granted, but only to the extent that it asserts a claim for breach of covenant of good faith and fair dealing. As to all other claims, TD's Motion is denied.

Dated: December 8, 2022

*/s/ Karen M. Williams*
KAREN M. WILLIAMS
United States District Judge